# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND BUILDING & BRIDGE CO., INC.,<br><br>       Plaintiff,<br><br>vs.<br><br>TOWN OF COHASSET,<br><br>       Defendant. | Case No.: 1:21-cv-11567<br><br>**COMPLAINT**<br><br>**PLAINTIFF DEMANDS TRIAL BY JURY** |

Now comes the Plaintiff, New England Building & Bridge Co., Inc., ("Plaintiff"), by and through its counsel, McElroy, Deutsch, Mulvaney & Carpenter, LLP, and files this complaint (the "Complaint") against the Town of Cohasset ("Defendant"), as follows:

## PARTIES

1. Plaintiff is a Rhode Island corporation in the business of construction contracting and maintains a principal place of business at 388 Veazie Street, Providence, Rhode Island 02904.

2. Upon information and belief, Defendant is a Municipal Corporation organized and existing under the laws of the Commonwealth of Massachusetts maintaining an address 41 Highland Avenue, Cohasset, Massachusetts 02025.

## JURISDICTION AND VENUE

3. Jurisdiction is proper pursuant to 28 U.S.C. § 1332. Upon information and belief, absolute diversity of citizenship obtains in this matter and the amount in controversy exceeds $75,000.00.

4. Pursuant to 28 U.S. Code § 1391, venue is proper. A substantial part of the events or omissions giving rise to this action occurred within this Court's judicial district and Defendant

1

is a municipality located within the Commonwealth of Massachusetts wherein the District resides.

## STATEMENT OF FACTS

5. On or about June 30, 2016, Plaintiff responded to an Invitation for Bids solicited by the Defendant for the project known as the rehabilitation of the Bound Brook Dam (the "Project").

6. The Project generally consisted of culvert construction, rehabilitation of the earth dam embankment, excavation, dewatering, upstream and downstream slope protection and various site work, including paving, seeding and sidewalk work.

7. The Project was bid as requiring 120 calendar days for completion, notwithstanding a September 1 — November 15, time of year restriction in which a contractor is prohibited from working in the water unless a water diversion channel has been previously approved by the Massachusetts Division of Fisheries ("MADOF") and installed.

8. Plaintiff was awarded the contract for the work (the "Contract") on August 1, 2016, however, it did not receive its notice to proceed until August 11, 2016.

9. The timing of the notice to proceed left less than three weeks to engage an appropriate engineering firm, prepare the necessary hydraulic calculations and design the specified cofferdam system (which would enable Plaintiff to work in the water during the restricted time of year period), submit and receive approval for the cofferdam system from the Town and its engineer, CDM Smith, Inc. ("CDM"), and, most importantly, receive approval from MADOF for the proposed water diversion channel, despite the contract stating the channel should be submitted by August 1, 2016.

10. Due to the delay in awarding the Contract, the Project was delayed by more

than sixty days (half the 120-day Project completion time), as Plaintiff was unable to work in the water until November 1, 2016.

### a. Gas Line Issues

11. The Project contained a gas line that ran through the construction area and the specifications in the Contract stated the gas line would be temporarily relocated.

12. On September 28, 2016, the utility company, National Grid, advised that the gas line was a one-way feed and could not be removed.

13. To remedy the gas line issue, the existing 8" steel pipe gas line was replaced with a 4" HDPE flexible pipe, which, based on National Grid's requirements, was to be back-filled with sand around the pipe and marked with tracer wire and warning tape.

14. In an effort to keep the Project moving, Plaintiff agreed to work around the gas line as long as it could be safely accomplished.

15. Subsequently, the utility contractor mismarked the gas line in the blast rock material, which was within the limits of excavation and demolition, causing Plaintiff to strike the mismarked gas line.

16. Plaintiff determined that it was unsafe to continue to work and demanded that either the gas line be relocated, as specified by the Contract, or a design be forwarded from CDM to adequately ensure the complete encapsulation of the line for the safety of the line and all work in the vicinity of the line.

17. Plaintiff ultimately received design criteria from CDM as to how to adequately work around the existing gas line, and was told that the work for the encapsulated utility structure would be paid on either a time and material basis or a lump sum basis.

18. Plaintiff's lump sum price was rejected and was directed to keep time and

proceed with work.

19. The gas line issue delayed Plaintiff by thirty-two days, increasing labor costs.

### b. Drainage Issues

20. The Contract required the design of a cofferdam, drainage bypass system, the dewatering of the area adjacent to the cofferdam and required installation of piping to maintain a minimum water flow of sixty cubic feet per second, which is the anticipated flow for a one-year and two-year storm, with ten inches of rain accumulating over a thirty day period.

21. The specifications required use of a 30" diameter siphon pipe to maintain the water level at the contractual elevation of forty-two feet above sea level.

22. Based on CDM's continuing assurances that the 30" pipe was adequate, and the expected drainage capacity of the site, Plaintiff proceeded to install the 30" pipe.

23. Plaintiff and CDM acknowledged that there was a risk of the cofferdam overtopping in the event of certain flood events and in such an event, Plaintiff would have to pump the area inside the cofferdam, as the 30" pipe passed water, to eventually lower the impoundment.

24. However, the impoundment only increased and it quickly became apparent that the 30" pipe was grossly insufficient for the actual field conditions encountered.

25. The insufficient piping caused Plaintiff and Defendant to question the hydraulics and hire GZA Environmental Engineering ("GZA") to review the hydraulic design.

26. After review, GZA was of the opinion that there was a problem with the hydraulic calculations and modeling.

27. In addition to the issues with the size of the piping, due to the late award of the Contract, issues with review, and time of year restrictions, Plaintiff was working in colder than

anticipated conditions that included higher than anticipated water levels than was bid, as the calculations were based on work during summer months.

28. Plaintiff lost months of work pumping out the additional and unanticipated water, all at Plaintiff's expense.

29. The pumping included two separate operations, one was to pump water from within the cofferdam to protect the gas line and the existing road, and the other to pump water from the outside of the upstream cofferdam to supplement the 30" pipe.

30. Defendant had an obligation to notify Plaintiff of the insufficient hydraulic design and had it done so, other options could have been considered such as larger cofferdams and pipes.

31. Plaintiff offered to reopen the flow of water through the winter and restart in the spring when dewatering would not be as difficult or problematic, this proposal would have been significantly more cost efficient to all involved, yet Defendant refused to entertain such proposal.

32. After the issues regarding the water, Defendant wanted the impoundment to now be maintained at an elevation of forty-four feet above sea level, not forty-two feet as was in the bid, requiring Plaintiff to install new 18" pumps.

33. Plaintiff has not been fully paid for its costs related to the installation of the pumps nor the associated delays.

   **c. Soil Issues**

34. Further complicating construction was the discovery of unsuitable soil and timbers, an indication of unsuitable soil, at the proposed elevation for concrete footings.

35. These conditions were previously unknown to Plaintiff but not Defendant, as after

having substantially completed the Project, Defendant provided an original control structure plan from 1975 that indicated unsuitable materials.

36. The unsuitable ground conditions, along with the rising waters, made performing to the specifications impractical and increasingly impossible.

37. Plaintiff ultimately received approval to put in place a mud slab on top of the unsuitable materials to build yet was never paid for the work involved.

38. Further costs and delays occurred due to the fact the mud slab could not be installed until after a major storm event which caused an extensive pumping operation.

### d. Notice of Possible Default

39. On or about June 16, 2017, after five months of delay, Defendant issued a Notice of Possible Contract Default and requested a meeting with Plaintiff's surety.

40. Defendant alleged, among other things, Plaintiff failed to provide a compliant schedule, failed to supply sufficient manpower, and failed to perform significant portions of the work.

41. The meeting was held on July 10, 2017, at which time, among other things, it was agreed that the Contract's completion date would be extended to August 17, 2017.

42. Plaintiff proceeded to substantially complete its work under the Contract as the roadway was fully opened to the public by August 17, 2017, there were, however, certain items of work that remained.

43. In addition to close-out paperwork the remaining work was completed, except where it required direction from the Defendant.

44. The remaining work included needing to remove certain subsurface sediment that was allegedly preventing a "weir gate" from being fully operational.

45. Defendant provided Plaintiff with previously-unseen forty year-old documentation that was in conflict with the Contract relating to the subsurface.

46. Plaintiff noted the discrepancy and requested clarification and direction, yet received no response from Defendant.

47. Further, Defendant informed Plaintiff that CDM would detail inadequacies of contractually-required Record Drawings, for which Plaintiff received no further communication.

48. The wetlands restoration was performed in accordance with the agreed upon specifications, yet Defendant claimed the work was never performed and did not respond to a requested meeting regarding this matter.

49. To repair alleged paving dips in the road, Plaintiff's subcontractor offered a remedial plan and requested a date to begin work but received no response from Defendant.

50. Despite requests, Defendant never provided a punch list for remaining work.

51. On November 3, 2017, Defendant terminated the Contract with Plaintiff for, among other things, failure to complete the Project in a timely manner.

52. To date, Defendant has failed to pay Plaintiff for the costs associated with the delays, the direction to perform additional work, and other damages incurred by Plaintiff during the course of the Project in the sum of $1,081,353.00.

## STATEMENT OF CLAIMS

### COUNT ONE
### (BREACH OF CONTRACT)

53. Plaintiff repeats and re-avers each and every one of the allegations set forth in the preceding paragraphs of this Complaint with the same force and effect as if each were fully set forth at length herein.

54. Plaintiff and Defendant entered into a valid and enforceable Contract, supported by consideration, related to the Project.

55. Plaintiff performed all work required under the Contract in a good and workmanlike manner and has demanded payment from Defendant, which demand has been denied without any justifiable cause.

56. Defendant's failure and refusal to pay Plaintiff for its work is a material breach of the Contract.

57. As a direct and proximate result of Defendant's material breach of the Contract, Plaintiff has sustained damages.

**COUNT TWO**
**(UNJUST ENRICHMENT)**

58. Plaintiff repeats and re-avers each and every one of the allegations set forth in the preceding paragraphs of this Complaint with the same force and effect as if each were fully set forth at length herein.

59. Defendant knowingly received the benefit from Plaintiff, as evidenced by: (1) Plaintiff's substantial completion of the Project; (2) Plaintiff's unpaid work due to the mismarked gas line; (3) Plaintiff's installation of pumps to adequately handle the drainage issues; and (4) the unpaid installation of the mud slab.

60. Defendant has retained this benefit without payment of reasonable compensation to Plaintiff.

61. Based on the reasonable expectations of the Parties, lack of reasonable compensation is unjust and at the Plaintiff's detriment.

62. Allowing Defendant to retain the benefit would only serve to unjustly enrich Defendant.

63. As a direct and proximate result of Defendant's unjust enrichment, Plaintiff has suffered damages.

## COUNT THREE
### (QUANTUM MERUIT)

64. Plaintiff repeats and re-avers each and every one of the allegations set forth in the preceding paragraphs of this Complaint with the same force and effect as if each were fully set forth at length herein.

65. Plaintiff performed all work on behalf of Defendant in a good and workmanlike manner with the expectation and understanding that it would be fully and fairly compensated.

66. Plaintiff had the reasonable expectation of compensation due to Defendant's representation regarding approval of performance and change orders.

67. Defendant had knowledge of Plaintiff's reasonable expectation to be compensated for its work performed on the project and subsequently failed to compensate Plaintiff.

## COUNT FOUR
### (PROMPT PAYMENT UNDER MASS. GEN. LAWS CH. 30, § 39K)

68. Plaintiff repeats and re-avers each and every one of the allegations set forth in the preceding paragraphs of this Complaint with the same force and effect as if each were fully set forth at length herein.

69. Massachusetts Gen. Laws ch. 30, § 39K, sets forth detailed procedures for the approving, disputing and paying contractors who perform work on public construction projects.

70. Defendant violated, and continues to violate this act by, among other things, failing to pay Plaintiff the amount reflected in its invoices and failing to timely respond to Plaintiff's invoices for periodic payments.

## COUNT FIVE
### (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

71. Plaintiff repeats and re-avers each and every one of the allegations set forth in the preceding paragraphs of this Complaint with the same force and effect as if each were fully set forth at length herein.

72. Every contract contains an implied covenant of good faith and fair dealing whereby neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

73. Defendant, by denying Plaintiff its rightful benefits, has acted in bad faith and breached the implied covenant of good faith and fair dealing.

74. As a direct and proximate result of Defendant's lack of good faith and breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered damages.

## **REQUEST FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully demands judgment against Defendant in its favor and on each count of this Complaint as follows:

1. On its First Cause of Action against Defendant:

    A.  Awarding compensatory damages in the amount of $1,081,353.00;

    B.  Awarding consequential damages;

    C.  Awarding interest as allowed by law;

    D.  Awarding attorney's fees and costs of suit; and

    E.  Awarding such other relief as the Court may deem just, equitable and proper.

2. On its Second Cause of Action against Defendant:

    A.  Awarding compensatory damages in the amount of $1,081,353.00;

    B.  Awarding consequential damages;

      C.      Awarding interest as allowed by law;

      D.      Awarding attorney's fees and costs of suit; and

      E.      Awarding such other relief as the Court may deem just, equitable and proper.

3. On its Third Cause of Action against Defendant:

      A.      Awarding compensatory damages in the amount of $1,081,353.00;

      B.      Awarding consequential damages;

      C.      Awarding interest as allowed by law;

      D.      Awarding attorney's fees and costs of suit; and

      E.      Awarding such other relief as the Court may deem just, equitable and proper.

4. On its Fourth Cause of Action against Defendant:

      A.      Awarding compensatory damages in the amount of $1,081,353.00;

      B.      Awarding consequential damages;

      C.      Awarding interest as allowed by law;

      D.      Awarding attorney's fees and costs of suit; and

      E.      Awarding such other relief as the Court may deem just, equitable and proper.

5. On its Fifth Cause of Action against Defendant:

      A.      Awarding compensatory damages in the amount of $1,081,353.00;

      B.      Awarding consequential damages;

      C.      Awarding interest as allowed by law;

      D.      Awarding attorney's fees and costs of suit; and

E.  Awarding such other relief as the Court may deem just, equitable and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues raised in this Complaint.

Respectfully Submitted,
Plaintiff, New England Building & Bridge Co., Inc.
By their Attorney

Dated: September 23, 2021

By: */s/ Clint D. Watts*
Clint D. Watts, Esq. (BBO # 692866)
McElroy, Deutsch, Mulvaney & Carpenter, LLP
Metro East Office Park
117 Metro Center Boulevard, Suite 1004
Warwick, RI 02886
Telephone: 401.298.9001
Facsimile: 401.921.2134
cwatts@mdmc-law.com